143 So. 38

## EUREKA HOMESTEAD SOC. v. NEWMAN et al.

No. 31323.

May 23, 1932.

Rehearing Denied June 20, 1932.

McCloskey & Benedict, of New Orleans, for appellant.

Titche, Kiam & Titche, of New Orleans, for appellees.

O'NIELL, C. J.

The Eureka Homestead Society brought this suit to annul a mortgage, for $4,000, and a pledge of 24 rent notes for $160 each, on the ground that the transaction was a fraud upon the homestead society, as a creditor of the mortgagor and pledgor, alleged to be insolvent. The suit was brought against the mortgagee and pledgee, Horace H. Newman, and against the mortgagor and pledgor, Norman F. Dahlman. Louis E. Schwartz also was made a party to the suit because he was the maker of the rent notes, being a tenant in the mortgaged building of Dahlman; but Schwartz afterwards deposited the monthly rent into the registry of the court, and is not now a party to the suit. The plaintiff alleged that the rent notes were not negotiable, because of the statement on their face that they were given "for value to be received in rent," and because there was written across their face, in red ink, "Rent Note—Subject to terms of Lease dated May 2, 1927," the date of the notes. Hence the plaintiff alleged that, in the transaction between Dahlman and Newman, the notes were not negotiated, in that no title passed or was

intended to pass from Dahlman to Newman, but that the notes were merely intended to be transferred and assigned as collateral security, the title remaining in Dahlman.

Dahlman, having left the state, did not defend or answer the suit. Newman's defense, primarily, was that the rent notes were negotiable instruments, because they were made payable to the order of the maker and indorsed by him, and therefore the title for the notes was conveyed by the mere transfer and delivery of them for a valuable consideration. Pretermitting the question of negotiability of the rent notes, Newman set up the alternative defense that the transaction complained of, by which he acquired the mortgage and pledge from Dahlman, was not subject to annulment at the instance of a creditor of Dahlman, first, because Dahlman was not insolvent at the time of the transaction, second, because he (Newman) was not aware of the insolvency if Dahlman was insolvent, and, third, that the transaction in which he (Newman) acquired the mortgage and pledge was a cash loan made by him to Dahlman, in good faith, and, being a cash transaction, would not be subject to annulment at the instance of a creditor of Dahlman even if Dahlman had been insolvent when the loan was made.

The case was decided in favor of the defendants. The plaintiff has appealed from the decision.

 On the question of negotiability of the rent notes, the attorneys on both sides cite and rely upon the decision in Tyler v. Whitney-Central Trust & Savings Bank, 157 La. 249, 102 So. 325; the plaintiff's attorneys here contending that the formula announced in the 'Tyler Case makes the rent notes in this case nonnegotiable instruments; and the attorneys for the defendant here contending that it makes them negotiable instruments. It is not necessary to decide whether these rent notes were negotiable or nonnegotiable instruments, in the meaning of the Negotiable Instrument Law, Act No. 64 of 1904. It is sufficient that the notes were transferable, to make the pledge of them valid, if it was not fraudulent; and the evidence shows that the transaction was not fraudulent.

The facts forming the outlines of the case are not disputed. On the 16th of August, 1927, the Eureka Homestead Society lent Dahlman $25,000 on a first mortgage and vendor's lien on an apartment house in New Orleans. An upper apartment was already leased to Louis E. Schwartz at $160 per month, represented by rent notes payable monthly, twenty-five of which notes were then outstanding. A lower apartment was leased to M. B. Sontheimer, the lease being nearly expired. The lease to Schwartz was on record, showing that his monthly rent for the ensuing twenty-five months was represented by outstanding rent notes, when the Eureka Homestead Society recorded its mortgage on the property. It was not producing any revenue beyond the rents paid by Schwartz and Sontheimer. On the 10th of September, 1927 —only twenty-five days after Dahlman had borrowed the $25,000 from the homestead society—he applied to Newman for a loan of $4,000, less the necessary discount, and offered a second mortgage on the apartment house, and a pledge of the Schwartz rent notes, said to be twenty-five in number, at $160 each, making exactly $4,000. Newman referred the matter to his attorney, and the latter examined the records and found that

the Schwartz lease was recorded ahead of the Eureka Homestead Society's mortgage, and, believing that the Schwartz rent notes were negotiable, the attorney recommended the loan. In the petition of the plaintiff in this suit it is said that Dahlman pledged to Newman twenty-four of the Schwartz rent notes, representing the rent from September 30, 1927, to September 30, 1929; but we infer from the testimony that Dahlman pledged twenty-five, being all that remained, of the Schwartz rent notes, the first of the twenty-five notes being payable on the 30th of September, 1927, and the last on the 30th of September, 1929. Newman got, as security for his loan, Dahlman's note for $4,000, payable one year from date, and secured by a second mortgage on the apartment house, and by a pledge of the Schwartz rent notes, indorsed on the back of the mortgage note, which, like the rent notes, bore interest from maturity. Dahlman allowed Newman a discount of 12½ per cent. on the amount of the mortgage note, receiving Newman's check for $3,500, which amount, less $30.60 costs, was paid to other creditors of Dahlman. We say that the discount on the loan was 12½ per cent., or $500; but, if Newman received only twenty-four notes, as alleged in the plaintiff's petition, the discount was only $340, or 8.8 per cent. Even though there may have been twenty-five notes pledged, and the discount, therefore, may have been 12½ per cent., it cannot be said that the discount was so great as to amount to a fraud upon other creditors of Dahlman; because the rent notes extended over a period of two years, and the second mortgage which Newman received turned out to be worthless. The reason for that was that Dahlman did not pay anything on his debt to the Eureka Homestead Society, and, when the society foreclosed its mortgage, in May, 1928, the debt due to the society, including taxes and costs, amounted to $30,278.-81, and the property was sold for only $26,-500, leaving a balance of $3,778.81 due to the homestead society.

The principal reason why the transaction complained of in this suit is not subject to annulment at the instance of a creditor of Dahlman, on the ground of fraud or unfair preference, is that the transaction was a cash transaction, and that Newman was not already a creditor of Dahlman. This suit is founded upon the provisions of section 7 of chapter 3 of title 4 of book 3 of the Civil Code, embracing articles 1968–1994, and entitled "What Contracts Shall be Avoided by Persons Not Parties to Them." Article 1978 declares that the right of action provided for in that section shall not apply unless the transaction between the insolvent debtor and one of his creditors is both fraudulent and injurious to other creditors. And it is well settled that the right of action does not apply to a sale or mortgage made by an insolvent debtor to a person who is not already a creditor, and for a cash consideration received at the time of the sale or mortgage. Brashear v. Alexandria Cooperage Co., 50 La. Ann. 587, 23 So. 540; Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419. Article 1984 of the Civil Code leaves no doubt about the proposition, because the article provides that a transfer of property, or a mortgage, as the case may be, by an insolvent debtor, is deemed to have been made in fraud of the creditors of the transferor or mortgagor if the transferee or mortgagee knew that the transferor or mortgagor was insolvent, and if

the contract gives to the transferee or mortgagee, *if he be a creditor*, any advantage over other creditors of the transferor or mortgagor. The controlling part of the article is the expression "if he be a creditor."

Counsel for the appellant cite two decisions in support of the proposition that a cash loan made to an insolvent debtor, by one who is not already one of his creditors, if secured by a mortgage on the borrower's property, may be set aside at the instance of a creditor of the borrower, as a fraudulent transaction, viz., Bank of Berwick v. George Vinson Shingle & Mfg. Co., 124 La. 1000, 50 So. 823, 26 L. R. A. (N. S.) 1068, and Calcasieu National Bank v. Campbell, 155 La. 378, 99 So. 337, 339. The case of the Bank of Berwick v. George Vinson Shingle & Mfg. Co. is reported also in 132 La. 861, 61 So. 850. The suit was brought by a judgment creditor of the estate of one Theodore A. Thorgeson, deceased, to annul a mortgage given by him to the George Vinson Shingle & Mfg. Co. to secure a loan of $5,000. The plaintiff's complaint was, first, that the lending of the money by the George Vinson Company was ultra vires, and, second, that Thorgeson was insolvent, to the knowledge of the George Vinson Company, when the mortgage was given, and that it was given in fraud of the rights of Thorgeson's creditors. The suit was dismissed by the district judge on an exception of no cause of action. On appeal the judgment was reversed, the exception of no cause of action was overruled, and the case was remanded for trial on its merits. When the case went back to the district court, the plaintiff abandoned the suit to annul the mortgage on the ground of fraud, and prosecuted the suit only to annul the mortgage on

the ground that the lending of the money by the George Vinson Company was ultra vires. See 132 La. 862, 61 So. 851, where, on the second appeal, the court said: "Plaintiff at first alleged that the Vinson Company had committed fraud in matter of the loan mentioned. This allegation of plaintiff was abandoned." The district court then held that the corporation's lending of its money on mortgage security was not ultra vires; and on the second appeal, the decision was affirmed. The case, therefore, is not authority for the proposition for which it is cited here.

In the other case cited, Calcasieu National Bank v. Campbell, the bank sued to annul a sale made by an insolvent debtor to his father, who knew of the insolvency. It is true, in a sense, that the father was not a creditor of the son at the time of the sale; but the father had signed and indorsed a note for $7,500 as surety for his son; the son had defaulted in the payment of the interest on the note for two years; and the court rested its decision upon the statement that "the condition of the principal's affairs to the knowledge of the surety, was such that he, the surety, was almost certain to have to pay the debt," and that it was for the purpose of satisfying the debt that the property was transferred by the principal to the surety. The situation was exactly the same, in so far as an unfair preference was given, as if the insolvent debtor had owed the $7,500 to his father, instead of his father's being surety for the son's debt.

Another reason why the transaction complained of should not be annulled on the ground of fraud is that Newman had no reason to believe that Dahlman was insolvent, if in fact he was insolvent, at the time of

the transaction. The evidence on that subject goes no further than to show that Dahlman's attorneys and intimate friends knew that he was in financial difficulties. But it seems quite certain that the officers and representatives of the Eureka Homestead Society did not believe that Dahlman was insolvent, twenty-five days before the transaction complained of, when they lent him $25,000 on long and easy terms, and did not deem it necessary to impound the rent of the property mortgaged, represented by promissory notes, identified with a recorded lease. In fact, it was virtually admitted on the trial of this case that the loan of $25,000 was thought to be only 70 or 75 per cent. of the value of the property, and hence that the property was supposed to be worth $33,000 to $35,000, only twenty-five days before the transaction now complained of. The truth is that the value of Dahlman's property fell off suddenly; and that brought about his insolvency. Our conclusion is that the judgment appealed from is correct.

The judgment is affirmed.